UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOSHUA DONTRELL SMITH                                CIVIL ACTION

VERSUS                                               NUMBER: 16-15778

SHERIFF JERRY J. LARPENTER, ET AL.                   SECTION "I"(5)

## REPORT AND RECOMMENDATION

Presently before the Court are the Rule 12(b)(6) motions to dismiss of Defendants, Richard "Peetie" Neal ("Neal"), Dr. Dickey Haydel ("Haydel"), and Dr. Michael Charlet ("Charlet"). (Rec. docs. 18, 20). Plaintiff has filed no memoranda in opposition to either motion.[1] For the reasons that follow, it is recommended that Defendants' motions be granted and that Plaintiff's suit be dismissed.

*Pro se* Plaintiff, Joshua Dontrell Smith, is an inmate of the Morehouse Parish Detention Center in Bastrop, Louisiana, who was at one time housed at the Terrebonne Parish Criminal Justice Complex ("TPCJC") in Houma, Louisiana. (Rec. docs. 21; 1, p. 3).[2] Invoking 42 U.S.C. §1983, Plaintiff brought this lawsuit against Terrebonne Parish Sheriff Jerry J. Larpenter, Neal, Haydel, and Charlet, complaining of the adequacy of the medical care that he received

---

[1] As Plaintiff has filed no memoranda in response to Defendants' motions, timely or otherwise, the Court may properly assume that he has no opposition to them. *Johnson v. Colvin*, 14-CV-0401, 2014 WL 4186790 at *1 n. 1 (E.D. La. Aug. 22, 2014)(citing Local Rule 7.5 and *Bean v. Barnhart*, 473 F.Supp. 2d 739, 741 (E.D. Tex. 2007)); *Jones v. Larpenter*, No. 13-CV-0056, 2013 WL 1947243 at *1 n. 1 (E.D. La. Apr. 12, 2013), *adopted*, 2013 WL 1947188 (E.D. La. May 10, 2013)(same); *Lucas v. Crowe*, No. 11-CV-2752, 2013 WL 870514 at *1 n. 1 (E.D. La. Feb. 15, 2013), *adopted*, 2013 WL 870437 (E.D. La. Mar. 7, 2013)(same). Of course, motions like the Defendants', even if unopposed, may be granted as long as they have merit. *Braly v. Trail*, 254 F.3d 1082, 2001 WL 564155 at *2 (5th Cir. 2001).

[2] Plaintiff signed his complaint on October 17, 2016 while he was still housed at TPCJC. (Rec. doc. 1, pp. 3, 6). By way of a filing of November 14, 2016, Plaintiff advised the Court that he had been transferred from TPCJC to the Franklin Parish Detention Center in Winnsboro, Louisiana. (Rec. doc. 5). He was subsequently transferred to the Tensas Parish Detention Center in Waterproof, Louisiana (rec. doc. 6), before being moved to the Morehouse Parish Detention Center.

at TPCJC. (Rec. doc. 1). Plaintiff alleges that at some point after being incarcerated at TPCJC in 2011, he was determined to be suffering from hypertension. (*Id.* at p. 5). In late 2014, Plaintiff states that he began being "over dehydrated" to the point that he started "catching spasms" and ended up having some kind of stroke which caused him to "fidget and twitch" in parts of his body such that he could not think straight. (*Id.*). Plaintiff indicates that he repeatedly asked for medical attention request forms and was finally taken to the hospital where MRI testing was performed, the results of which he was never made aware of until the third or fourth such test. (*Id.* at p. 10). Plaintiff states that he then went under the care of Dr. Haydel who began treating him with Dilantin, an anti-seizure medication Plaintiff believes was not indicated as he has never suffered from seizures. (*Id.*). Plaintiff subsequently began receiving "hospital treatment" from Dr. Charlet, a neurologist, who prescribed him Zanaflex and Vitamin D3. (*Id.*).

After taking the medications prescribed by both Doctors Haydel and Charlet, Plaintiff states that he began having trouble seeing straight and keeping his balance. (*Id.*). Upon reporting these side-effects to Dr. Charlet, he was advised to discontinue the Dilantin that had been prescribed by Dr. Haydel (*Id.*). Plaintiff states that another MRI was performed which revealed a small amount of torn tissue in his brain. (*Id.*). Despite those test results, Plaintiff indicates that nothing further was prescribed for the "newly discovery," that his serial requests for medical care were ignored, and that he has not seen Dr. Charlet again in over nine months. (*Id.*). Plaintiff states that he then began submitting prison grievance forms regarding the adequacy of his care, all of which were met with the response that he had an appointment scheduled in the near future or were otherwise mishandled by Neal, who is not even an appropriate screening officer. (*Id.*). For the pain and suffering that he has endured,

Plaintiff seeks $2,000,000 in damages in addition to an unspecified amount of lost wages. (*Id.* at p. 5).

The moving Defendants now seek dismissal of Plaintiff's lawsuit under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[3/] In considering a motion under Rule 12(b)(6), the Court accepts all well- pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007). However, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S.Ct. 1937, 1949 (2009). The Court must therefore identify pleadings that are conclusory and are not entitled to the assumption of truth and legal conclusions must be supported by the factual allegations that are pled. *Id.* at 677-78, 129 S.Ct. at 1949. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Id.* While a complaint need not contain detailed factual allegations, it does demand more than an unadorned, "the-defendant-unlawfully-harmed-me" accusation. *Id.*

By way of their present motion, Neal and Haydel seek the dismissal of Plaintiff's claims against them, arguing that Plaintiff has not adequately pled a claim for deliberate indifference under *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976) and its progeny and that he has not identified a policy or custom that is the moving force behind the alleged constitutional violation. For his part, Charlet argues that he, in his official capacity,

---

[3/] Although Sheriff Larpenter has not joined in the moving Defendants' motions, the defenses that are available to him may be raised by the Court in light of the fact that Plaintiff is proceeding herein *in forma pauperis* pursuant to 28 U.S.C. §1915. *Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 97 (5th Cir.), *cert. denied*, 513, U.S. 883, 115 S.Ct. 220 (1994).

3

is not a "person" who is capable of being sued under §1983, that Plaintiff's allegations are otherwise insufficient to state a cognizable claim of deliberate indifference to his serious medical needs, and that Charlet is entitled to qualified immunity from any §1983 claim made against him in his individual capacity.

The Court will first address the motion to dismiss filed by Neal and Haydel which, as it turns out, raises defenses that are equally applicable to the non-moving Defendant, Sheriff Larpenter, all three of whom are municipal officials. As to all of the Defendants, Plaintiff gives no indication in his complaint of the capacity(ies) in which they are being sued. In that regard, "[w]hen a pro se plaintiff does not specify in his complaint whether a defendant is named in his or her official or individual capacity, it is generally presumed by operation of law that the defendant is named in his or her official capacity." *Douglas v. Gusman*, 567 F.Supp. 2d 877, 888-89 (E.D. La. 2008). "'In a suit brought against a municipal official in his [or her] official capacity, the plaintiff must show that the municipality has a policy or custom that caused his injury.'" *Carter v. Strain*, No. 09-CV-0015, 2009 WL 3231826 at *2 (E.D. La. Oct. 1, 2009)(quoting *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007), *cert. denied*, 555 U.S. 813, 129 S.Ct. 42 (2008)). "'A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity.'" *Id.* (quoting *Colle v. Brazos County, Texas*, 982 F.2d 237, 245 (5th Cir. 1993)). Rather, the plaintiff ". . . must identify the policy or custom which allegedly caused the deprivation of his constitutional rights." *Id.* (citing *Murray v. Town of Mansura*, 76 Fed.Appx. 547, 549 (5th Cir. 2003) and *Treece v. Louisiana*, 74 Fed.Appx. 315, 316 (5th Cir. 2003)).

Measured against the foregoing standards, Plaintiff's allegations against Neal, Haydel, and Larpenter in their official capacity fail to state a claim upon which relief can be granted

4

as he does not allege that the purported deprivation resulted from a policy or custom, much less identify any such policy or custom. *Carter*, 2009 WL 3231826 at *2. "A plaintiff asserting a [S]ection 1983 claim against a municipal official in his official capacity … 'must plead facts showing that a policy or custom existed, and that such custom or policy was the cause in fact or moving force behind a constitutional violation.'" *Mays v. Bd. of Comm. Port of New Orleans*, No. 14-CV-1014, 2015 WL 1245683 at *9 (E.D. La. Mar. 18, 2015)(footnote omitted). As Plaintiff makes no such showing here, his §1983 claims against Neal, Haydel, and Larpenter in their official capacity should be dismissed for failure to state a claim under Rule 12(b)(6) and 28 U.S.C. §1915(e)(2)(B)(ii). With respect to Plaintiff's §1983 claim against Dr. Charlet in his official capacity, the law is clear that "[s]tate employees sued in their official capacities for monetary damages simply are not considered 'persons' subject to suit under 42 U.S.C. §1983." *Stewart v. Warner*, No. 13-CV-4759, 2014 WL 3498165 at *3 (E.D. La. Jul. 15, 2014)(citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312 (1989)(and other cases)). "Additionally, because a claim against a state employee in [his or] her official capacity for monetary damages is actually a claim against the state itself, such claims are barred by the Eleventh Amendment." *Id.* (citing *Williams v. Thomas*, 169 Fed.Appx. 285, 286 (5th Cir. 2006)(and other cases)). For these reasons, Plaintiff's §1983 claim against Charlet in his official capacity should likewise be dismissed for failure to state a claim upon which relief can be granted.

      Turning to Plaintiff's §1983 claim against all four of the named Defendants in their individual capacities, they, as governmental officials performing discretionary functions, are entitled to qualified immunity from damages for civil liability, provided that their actions could reasonably have been thought to be consistent with the rights they are alleged to have

5

violated. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006)(citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038 (1987)). In determining whether a governmental official is entitled to qualified immunity, the appropriate inquiry is: (1) whether the plaintiff has demonstrated a violation of a clearly established federal right <u>and</u> (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known. *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508 (2002)). Those two prongs may be considered in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009). Once raised, the plaintiff bears the burden of rebutting the qualified-immunity defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Gobert*, 463 F.3d at 345 (quoting *Estate of Davis v. N. Richard Hills*, 406 F.3d 375, 380 (5th Cir. 2005)).

As will be discussed more fully below, because the Court does not believe that the moving Defendants, in their individual capacity, were deliberately indifferent to Plaintiff's serious medical needs, they are entitled to qualified immunity from Plaintiff's §1983 claim for monetary damages. However, Plaintiff's §1983 claim against the non-moving Defendant, Sheriff Larpenter, in his individual capacity warrants special treatment here. Although Plaintiff names the Sheriff as a Defendant in the caption and on page four of his complaint (rec. docs. 1, p. 1; 8, p. 1), he presents no factual allegations whatsoever illustrating the Sheriff's participation in the alleged constitutional violation, a necessary requirement to a civil-rights cause of action. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). "To state a cause of action under §1983, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, <u>specifying the personal involvement of each defendant</u>." *Jolly v. Klein*, 923 F.Supp. 931, 943 (S.D. Tex. 1996)(emphasis added)(citing *Murphy v. Kellar*,

6

950 F.2d 290, 292 (5th Cir. 1992)). Moreover, supervisory officials like the Sheriff cannot be held liable for federal civil-rights violations allegedly committed by their associates based merely on a theory of strict or vicarious liability. *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.), *cert. denied*, 471 U.S. 1126, 105 S.Ct. 2659 (1985); *Carter*, 2009 WL 3231826 at *1. In light of these authorities, it will be recommended that Plaintiff's §1983 claim against Sheriff Larpenter in his individual capacity be dismissed for failure to state a claim pursuant to §1915(e)(2)(B)(ii).

The Court next turns to Plaintiff's primary claim against the moving Defendants in the instant matter, *i.e.*, that they were deliberately indifferent to his serious medical needs. Pursuant to an order that was previously issued by the undersigned (rec. doc. 19), the Court, as well as Plaintiff, has been provided with a copy of the medical records that were generated at TPCJC. (Rec. doc. 23). A discussion of those records that were generated during the relevant time period follows.[4/]

On October 20, 2015, Plaintiff completed and submitted a "Request for Medical Attention Form" seeking medical care for bladder pain/discomfort when voiding and shortly thereafter. TPCJC medical personnel responded to Plaintiff's request that day by providing him with a specimen cup so that urinalysis could be conducted. Six days later, Plaintiff submitted another medical attention request form regarding pain in his right ear. Plaintiff was evaluated by an EMT later that day and was prescribed a three-day course of antibiotics.

---

[4/] As Plaintiff signed his complaint on October 17, 2016 (rec. doc. 1, p. 6), consideration of any §1983 claim for the alleged denial of needed medical care which pre-dates the latter date by greater than one year is barred by the one-year prescriptive period applicable to such claims. *See*, *e.g.*, *Lewis v. Bossier Parish Sheriff's Dept.*, No. 07-CV-0394, 2010 WL 1006239 at *2 (W.D. La. Feb. 22, 2010), *adopted*, 2010 WL 1006197 (W.D. La. Mar. 16, 2010), *appeal dis'd*, 396 Fed.Appx. 102 (5th Cir. 2010).

7

Pursuant to an original referral by Dr. Haydel, on November 22, 2015, Plaintiff was examined by Dr. Charlet of the Chabert Neurology Clinic as a follow-up to a previous visit which had taken place on July 20, 2015. The reasons for the visit were listed as spasm of the muscle, dizziness, headaches, and to obtain test results. Plaintiff was in no pain at the time. In discussing the "history of present illness," Dr. Charlet noted that Plaintiff was compliant with the medications that he had prescribed without any adverse side-effects, that he no longer suffered from muscle spasms since starting on Zanaflex, that he took Vitamin D daily, and that Dilantin had been discontinued. A physical examination yielded unremarkable results including normal cranial nerves, normal motor strength and reflexes, normal gait, and normal cerebellar and sensory exams. Dr. Charlet's treatment note indicates that "[t]est results including MRI reports, laboratory data, [and] EMG and EEG results were reviewed and discussed at length." The assessment was an abnormal brain scan, dizziness, and spasm of the muscle that was resolved with Zanaflex. The plan was to proceed with a repeat MRI to assess any interval changes. Medications included Prinzide and Plaintiff was to be re-evaluated in four months.

On December 1, 2015, Plaintiff was seen by TPCJC medical staff after complaining of feeling "bad" and dizzy just lying in bed. His blood pressure was measured at 131/82 and Plaintiff was to be referred to the doctor for an increased blood pressure check. That went forward on December 3, 2015 and Plaintiff was issued a refill on his Lisinopril. On December 17, 2015, Plaintiff underwent the repeat MRI that had been recommended by Dr. Charlet. Although the results of the study were degraded by motion artifact, when compared with a previous study of June 4, 2015 the impression was persistent extensive abnormal signal noted in the cerebral white matter, posterior limbs internal capsule, and brainstem,

including the mid-brain, pons, and medulla, without appreciable improvement but with no associated abnormal enhancement seen.

On December 28, 2015, Plaintiff submitted another medical-attention request form complaining of chest pain and consistently high blood pressure. Plaintiff was seen by medical personnel the following day who noted that his blood pressure had been monitored that day and the previous day and that it continued to decrease. It was also noted that Plaintiff had missed two doses of blood-pressure medication that month. Plaintiff was given doses of aspirin to take with his prescribed medication. On that same date, Plaintiff completed an "Inmate Request Form" which he directed to "Mr. Petee" and in which he inquired as to what action would be taken with respect to his supposedly high blood pressure. That request was formally responded to on January 7, 2016 with a jail official advising Plaintiff that he would be placed on a low-sodium diet and that the doctor would review the rise in his blood pressure at the next available visit. Plaintiff's special diet was ordered that same day.

Plaintiff submitted another medical-attention request form on January 12, 2016, complaining of chest pain since the previous night. When seen by medical personnel the following day, Plaintiff's blood pressure was within normal limits and he reported that the pain was actually to his throat area. Plaintiff was seen by Dr. Haydel for a further blood pressure check two days later and his condition was to be monitored in light of the most recent reading being 126/82. The following day, Plaintiff requested additional medical attention for a sore throat. Plaintiff was examined later that day and redness to his throat was noted with no swelling, symptoms of congestion, or a cough. Plaintiff was advised to gargle with epson salt to relieve his throat discomfort.

9

On January 18, 2016, Plaintiff submitted another medical-attention request form indicating that his discomfort had moved from his throat to lower chest. Plaintiff was seen by prison medical personnel later that day and his blood pressure was within normal limits at 130/90. He was given Tums in an attempt to relieve his discomfort. In yet another medical-attention request form that was dated March 13 or 18, 2016, Plaintiff complained of being weak and dizzy after working out the previous day. Plaintiff was seen by medical staff on March 18, 2016, who measured his blood pressure at 122/96 and advised him not to work out as much. On the same day, Plaintiff submitted another medical attention request form complaining of spasms down the left leg and back and feeling dizzy and lightheaded like the onset of a "night stroke." Plaintiff was seen by the physician the following day and his blood pressure was 128/77. He was to be referred for further evaluation. Plaintiff's condition was monitored by an EMT on March 21, 2016 and his blood pressure was within normal limits. He was advised to increase his fluid intake and to stay hydrated.

An authorization for the release of Plaintiff's most recent MRI test results was executed on March 24, 2016. Pursuant to another medical-attention request form, Plaintiff was seen again by a TPCJC EMT on March 26, 2016 for complaints of chest congestion and a productive cough. He was placed on a course of Keflex and Cefotiam to address his symptoms. The next request form was not submitted by Plaintiff until June 13, 2016 in which he requested Hydrophor ointment for dry skin on his feet. Plaintiff's chart was reviewed by the medical staff that same day who noted an absence of physician orders for the requested ointment. Plaintiff was thus instructed to purchase lotion from the TPCJC commissary.

On July 6, 2016, Plaintiff was seen by medical staff for complaints of dizziness and possibly passing out. He told examining personnel that he experienced such symptoms, as

well as cramping, when working out. As Plaintiff's vital signs were in the normal range, he was advised to increase his fluid intake. A second authorization for the release of Plaintiff's most recent MRI results was executed on the same day. On July 25, 2016, Plaintiff was again brought to the medical department with complaints of feeling lightheaded and dizzy secondary to engaging in recreation. Plaintiff reported minimal fluid intake and his vital signs were within normal limits. He was instructed to increase his fluid intake and was allowed to return to the dorm.

On August 9, 2016, a follow-up appointment was scheduled for Plaintiff at the Chabert Neurology Clinic on October 14, 2016. In securing that appointment, the scheduling nurse noted that Plaintiff was to have been seen for follow-up in March of 2016 but was not due to "… immense problems getting records for this inmate." Plaintiff complained of continued lightheadedness on August 19, 2016 and was seen by medical personnel later that day for a coordination deficit. Plaintiff was to be referred for further consultation and three days later it was noted that he had an upcoming appointment at the Neurology Clinic on October 14, 2016. He submitted another inmate request form shortly thereafter inquiring about his most recent MRI results. That inquiry was formally responded to on August 23, 2016 with Plaintiff being advised of his upcoming Neurology Clinic appointment.

Plaintiff completed another medical attention request form on August 29, 2016 regarding his ongoing concerns and he was seen by medical personnel that day, who reminded him of his pending Neurology Clinic appointment. On September 12, 2016, Plaintiff completed and submitted an inmate grievance form complaining that he had never received the MRI results of December 17, 2015 and that despite several such tests, the attending personnel had thus far failed to pinpoint his medical problem. (Rec. doc. 1, p. 7).

Plaintiff requested immediate hospital medical attention from a specialist and the results of all testing. (*Id.*). That grievance was formally responded to on September 13, 2016 with Plaintiff being advised that he had a scheduled appointment with a neurologist in the near future. (*Id.*). Plaintiff then submitted another inmate request form on September 20, 2016 essentially complaining of the same matters that were set forth in his most recent grievance. That form was responded to on September 21, 2016 with a further reminder about Plaintiff's upcoming neurologist appointment.

On September 26, 2016, Plaintiff submitted a second inmate grievance form which is of poor readable quality but does appear to center on his ongoing health concerns. (Rec. doc. 1, p. 8). That grievance was met with the same response as Plaintiff's first. (*Id.*). On October 11, 2016, a member of the TPCJC medical staff authored a medical summary denying Plaintiff trusty status as he was then under doctor's care for a history of hypertension and cardiac problems. On that same day, Plaintiff submitted a third inmate grievance form complaining of the delay in seeing a neurologist. (Rec. doc. 1, p. 9). Plaintiff requested medical attention from a specialist and a §1983 complaint form. (*Id.*). On October 12, 2016, this third grievance was formally responded to with Plaintiff once again being advised that his scheduled appointment was imminent. (*Id.*).

On October 14, 2016, Plaintiff was evaluated by Dr. Joshua Smith of the Chabert Neurology Clinic. He was in no pain at the time and his medical history was positive for hypertension for which he was taking Lisinopril. Plaintiff advised Dr. Smith that he no longer suffered from muscle spasms, and thus had not needed to take Zanaflex, but that he experienced lightheadedness when out in the sun or when quickly rising from a sitting to standing position. During such episodes, Plaintiff reported difficulty walking and running.

12

Plaintiff denied syncope/loss of consciousness/trauma as well as chest pain/shortness of breath/palpitations. Upon physical examination, Plaintiff had a normal heart rate and rhythm with no gallop, rub, or murmur. Pulmonary effort and breath sounds were normal with no wheezes or rales. Musculoskeletal and neurological exams were normal. The assessment was lightheadedness and a previous abnormal brain scan. The cause of the lightheadedness was thought to be 2/2 orthostasis. Seizures were not suspected based on the available test results and a repeat MRI was to be ordered. Plaintiff was to return for further follow-up evaluation in approximately five months. As confirmed through defense counsel, Plaintiff was transferred from TPCJC on October 26, 2016.

With the foregoing medical records in mind, records upon which the Court may properly rely, *Gobert*, 463 F.3d at 346 n. 2,[5/] the Court thus turns to the sufficiency of the allegations made by Plaintiff against Neal, Haydel, and Charlet. In order to establish a constitutional violation, Plaintiff must demonstrate that those Defendants were deliberately indifferent to his serious medical needs which constituted an unnecessary and wanton infliction of pain.[6/] *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifference is an "extremely high" standard to meet, *Gobert*, 463 F.3d at 346, one that has been equated with "subjective recklessness" as that term is used in criminal law. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997). A prison official shows deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that

---

[5/] "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).
[6/] This standard is the same for both pre-trial detainees and convicted prisoners. *Hale v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996).

a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted). If an inmate in fact receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain or other symptoms persist despite the treatment. *Gobert*, 463 F.3d at 345; *Williams v. Chief of Medical Operations, Forrest County Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010), *adopted*, 2010 WL 3171040 (E.D. La. Aug. 6, 2010). That an inmate's medical care "… may not have been the best money could buy" is insufficient to establish a constitutional violation, *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992), and a prisoner is not entitled to medical treatment of his choosing simply upon request. *Stafford v. Kelly*, No. 09-CV-0133, 2011 WL 2633034 at *2 (N.D. Miss. June 3, 2011), *adopted*, 2011 WL 2633174 (N.D. Miss. July 5, 2011). And where a §1983 claim is premised on a delay in the provision of medical care, a prisoner must also establish that he suffered substantial harm as a result of the delay. *Richard v. Martin*, 390 Fed.Appx. 323, 325 (5th Cir. 2010). "Experiencing 'occasional delays in obtaining' medical treatment is insufficient to prove a refusal of providing medical care when the inmate's … medical records demonstrate that he received treatment." *Taylor v. Bexar County*, No. 10-CV-0045, 2011 WL 759459 at *4 (W.D. Tex. Feb. 23, 2011)(quoting *Gobert*, 463 F.3d at 346); *Richard*, 390 Fed.Appx. at 324-25.

As respects Neal, Haydel, and Charlet, the medical records that have been provided to the Court fall far short of establishing the objective and subjective components needed to prevail on a claim of deliberate indifference. As for Haydel, the extent of Plaintiff's allegations is that the doctor prescribed Dilantin which Plaintiff did not feel was indicated due to the fact that he had never suffered from a seizure disorder notwithstanding his admitted reports of "catching spasms" and supposedly suffering from some form of a stroke which caused his body to "fidget" and "twitch." Initially, although falling outside of the relevant time period (*see* note 3, *supra*), the Court has reviewed Plaintiff's medical records that were generated at TPCJC in 2014. While he was treated that year for a range of maladies, including elevated blood pressure, pain to the testicular area, toothache and tooth extraction, and dry/irritated skin, there is no indication that he was evaluated for anything in the nature of a cerebrovascular accident ("CVA"). Likewise, none of the medical records generated subsequent to 2014 reference Plaintiff suffering a CVA. In any event, the decision of which specific medication to prescribe Plaintiff is a classic example of a matter of medical judgment which is not actionable under §1983. *Brauner v. Coody*, 793 F.3d 493, 498-99 (5th Cir. 2015)(quoting *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293).

Just like those related to Dr. Haydel, Plaintiff's allegations against Dr. Charlet are similarly insufficient to establish §1983 liability. Plaintiff alleges that after going under the care of Dr. Charlet, he was prescribed Zanaflex and Vitamin D3. Some time later, Plaintiff reported experiencing side-effects from taking that medication and supplement along with the Dilantin that Dr. Haydel had previously prescribed. Accordingly, Dr. Charlet advised Plaintiff to discontinue the Dilantin. Not only was that medication adjustment a non-actionable matter of medical judgment, *Brauner*, 793 F.3d at 498-99, it appears to have been

15

of significant benefit to Plaintiff because on November 25, 2015, he reported to Dr. Charlet that he "[n]o longer has muscle spasms since taking Zanaflex." Plaintiff was still spasm-free when he was re-evaluated at the Neurology Clinic on October 14, 2016. The specific allegations that Plaintiff advances against Dr. Charlet are insufficient to establish §1983 liability here.

Finally, the particular allegations that Plaintiff makes against Neal center on the handling of the inmate grievance forms that Plaintiff submitted regarding the speed with which he was provided treatment and the efficacy of that treatment. Plaintiff complains that he was simply reminded of his then-pending Neurology Clinic appointment in response to the grievances and that Neal, at any rate, was not the appropriate prison official to screen or to respond to those grievances. The Court recalls that in each of those grievance forms, the specific relief requested by Plaintiff was to be seen by a specialist. While it is unfortunate that the Clinic appointment could not be secured more expeditiously, Plaintiff's disagreement with the timing of the medical services that he was provided cannot support a §1983 claim. *Desroche v. Strain*, 507 F.Supp.2d 571, 583 (E.D. La. 2007)(citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)). Plaintiff's dissatisfaction with the manner in which his grievances were handled is likewise unavailing, as inmates like himself have no constitutional right to an adequate and effective grievance procedure or to have their complaints investigated and resolved to their liking. *Propes v. Mays*, 169 Fed.Appx. 183, 184-85 (5th Cir. 2006); *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005); *Tyson v. Tanner*, No. 08-CV-4599, 2009 WL 2883056 at *5 (E.D. La. Aug. 25, 2009). In any event, no substantial harm is shown as a result of any delay. *Richard*, 390 Fed.Appx. at 325.

The fact that the medical care that Plaintiff received while housed at TPCJC was unsuccessful – even if it was negligently provided – does not equate with deliberate indifference. *Gobert*, 463 F.3d at 346. And the existence of continuing pain and other symptoms, while certainly unpleasant, does not in and of itself demonstrate that a constitutional violation occurred. *Mayweather*, 958 F.2d at 91. Based on a review of the medical records that have been provided to the Court, the allegations made by Plaintiff simply do not establish deliberate indifference on the part of the named Defendants.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that the Defendants' motions to dismiss be granted and that Plaintiff's lawsuit be dismissed for failure to state a claim under Rule 12(b)(6) and 28 U.S.C. §1915(e)(2)(B)(ii).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[7]

---

[7] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.

New Orleans, Louisiana, this  3rd  day of                May               , 2017.

                                                MICHAEL B. NORTH
                                     UNITED STATES MAGISTRATE JUDGE